Proceed if the if the court is ready. Thank you, Your Honor. And may it please the court, Andrew Tutte for Appellant George Anibowei. This case involves applying the core protection of the Fourth Amendment to a new factual circumstance. It has always been the case that crossing the United States border did not give border agents the authority to search through the private papers and the drawers and the bureaus and cabinets of somebody's house. And that protection should not evaporate more than 200 years after the founding because we have the technological development of smartphones that have resulted in people carrying that information in their pockets. The court should preserve the traditional warrant requirement for searches of cell phones at the border for three reasons. First, cell phone searches are unique because the degree of intrusion on individual privacy brought about by a cell phone search is unmatched. As the Supreme Court observed in Riley, such a search exposes more about a person to government agents than the most exhaustive search of a house unless the cell phone is in the house. Second, cell phone searches are simply too attenuated from the interests underlying the border search exception. Very little data on a cell phone is or can be contraband and smuggling data on a phone makes no sense when the data could be more easily moved into or out of the United States via the internet. Moreover, someone determined to smuggle data on a phone can defeat a border search through encryption or other means. Third, extending the border search exception to cell phones would create significant Fourth Amendment anomalies and threaten core First Amendment values. The same reasoning. The first two reasons that you gave us are factual, are essentially factual inquiries that we would have to have a record developed on. Is that correct? Two answers, Your Honor. First, the Supreme Court in Riley considered these questions that had breathtaking consequences for all searches incident to arrest in the context of suppression motions in criminal cases. And second, it has never been the case that the way litigate a Fourth Amendment question is to look at the sort of individualized facts. You develop an extensive factual record about these specific questions. And third, I'd like to make a third point, which is that we think that the degree of intrusiveness of these searches is certainly within the court's judicial notice. Every person carries a cell phone. As the Supreme Court said in Riley, the proverbial visitor from Mars would think that it was an important part of human anatomy. These phones are something that is are so common and so ubiquitous. And the degree of intrusion is so well known that it's not necessary to develop expert testimony on that particular point. So those would be my three points on that. You argued that it's easier to get digital contraband in the United States to the internet than the phone. I don't know that I can take judicial notice of that. Your Honor, I would submit that it is undisputed that a warrant would be required to intercept communications sent over the internet. So the data would certainly have more protection from the government's prying eyes if it was sent via the internet. So we think that just the structure of Fourth Amendment law shows that getting the data into the United States because internet communications are better protected than cell phones means that you would use the internet. And that actually goes to my point about the anomalies that would be created within Fourth Amendment law if these searches are authorized. Because the same reasoning that would permit warrantless cell phone searches, because cell phones might contain data of interest to the United States, would permit the warrantless interception of all cross-border communications. Any communications that happen to cross the United States border would be subject to the same warrantless, potentially suspicionless search regime. Because what the government is saying it is interested in is finding digital contraband, which can be transmitted via a phone call, it can be transmitted via an email, it can be transmitted by sending a file to a remote storage location. So, you know, internet communications, just by their very nature, cross borders because of the nature of the internet. But also many of the services that we find essential, such as the service that we're using right now to have this oral argument, use overseas servers as part of their data transmission. So, it really is essential to the infrastructure of the modern world that information and data will cross borders. And you can see that border security lessens the constitutional protections of not only individuals crossing the border and the government's right to know who they are, but also items. It seems to me there are protections. I mean, if you go to the airport, you come from certain locations, they'll even go through your luggage, which we would typically say is a privacy-protected place where people keep things. Certain types of vegetation, the government does not want to cross the border. Aren't there any number of things at the border that we would normally say are constitutionally protected, but rather are compromised in the interest of border security? Yes, your honor. Absolutely. And we think that the security interests at the border are important, but that the balance for this very specific and a unique technology strikes a different balance than literally anything else that crosses the border. If you visited certain countries that were suspect and you arrived at JFK in New York and customs wanted to look in your suitcase, you don't think that that's analogous to a cell phone that might contain things such as either drug, narcotic information, financial information that might be suspect or even, you know, worse child pornography or things of that sort? Your honor, we see the analogy, but we note that cell phones go beyond the analogy because of the incredible volume of information and private information that they contain. And in fact, the Riley decision really engaged with this analogy quite a bit because it's a ready analogy in the search incident to arrest context as well. There can be dangerous information on the phone. The specific example of financial records was brought up by the chief justice in the unanimous Riley decision. And he said, but the difference is even though a bank record could be on your person when you're arrested, it won't have five years. You won't have five years of bank records on your person, but you will on your cell phone. It's that incredible difference in volume. Justice Alito at oral argument in that case said, well, what about a billfold with photos? I mean, people carry private photos with them, but as the chief justice said in the opinion, the difference is that all the photos are date stamped and it's every photo you've taken for the past five years. And it's not just the photos you intend to take on your trip with you across the border. So we readily see the analogy, but we also point that to the fact that there are things about cell phones that amount of information on literally every person because everyone carries cell phones that makes them different than almost anything else that has been routinely carried on the person in really the history of the United States. You know, I mean, there are cases that say that if you take a mobile home across the border, you are giving a border agents the ability to search it because you're bringing your own home across the border. But that's such a rare circumstance that it's readily distinguishable from cell phones because everyone is carrying their entire life with them on their cell phone. And so you'd be by creating this regime or by not by extending the border search exception, you're asking every person to sort of take precautions in order to pivot to which is that the 50,000 travelers that cross the Juarez-El Paso border each day and the 100,000 that cross the San Diego-Tijuana border each day would be shocked to discover that their information, everything about them is actually vulnerable to inspection by government agents on their cell phone because they go shopping or commute to work or go to a doctor's appointment. There are many people who live on one side of the border and work on the other. And that is sort of what is materially at stake in some sense is all those people have no idea that their cell phones are actually vulnerable to government search. Let me ask you a question since we're here on the issue of the injunctive relief. As I understand it, is there any reason to suspect that the your client, Mr. and I hope I don't mispronounce his name, Mr. Anaboe in the future? Is this a one-time thing or is this why is he here seeking injunctive relief on something that we have no circuit authority to my knowledge that directly and I think that's your point your argument today is that we need this is a relatively new concept and new protection. We have no authority on that so the issue of prevailing on the merits is still up in the air. Number one and number two, we don't have any idea unless you can tell me what the future harm would be to Mr. Anaboe himself. Yes, your honor. The record, the undisputed facts are that he hasn't been searched just once or just twice. He's been searched five times and though it's a little outside the record, it was literally every time he traveled internationally for the last several years and we could put that into the record if the court needed it but we think that the point being that this was not a one-off and in part the reason the case was litigated as it was because this case has been around for a long time was the sense that you know it's going to happen once but it's not going to happen again and then it happened again and again and again. Is he on a list or does everyone's cell phone get this kind of routine search? No, not everyone's cell phone gets this kind of search but it is totally unclear why Mr. Anaboe has been searched this many times and 30,000 travelers each year and it goes up each year are searched. It's true that hundreds of millions cross the border but for those thousands, these searches are incredibly intrusive and for Mr. Anaboe obviously, his attorney-client privileged information was actually taken and retained by government agents and even though he leaves his work cell phone behind now when he travels internationally, he doesn't leave his personal cell phone behind because he feels like that would put him completely out of touch with anyone who wants to get in touch with him and it still contains a limited amount of attorney-client information that is exposed to government agents every time he travels and so there are two forms of irreparable harm. There's every day knowing that his client's privileged information, some of them in proceedings adverse to the government, is still in government possession and second, that he very reasonably expects that he will be subject to a search like this again the very next time he travels when travel becomes more available due to the pandemic. I hope I answered your question, Judge Engelhardt. I want to talk about for the first, there's just one more thing which is the First Amendment freedoms at stake which is that he just in this very case, my client has changed his behavior because of the vulnerability to these searches and he's a totally law-abiding person who has never had anything found on his cell phone so the chill on actual innocent people is very real and people who are now changing their behavior, taking extra steps to leave things behind to avoid the government intrusion, it is happening. I actually want to turn back to the national security point because I think it's the government's, it's the point that has caused the most difficulty for the courts. It's the one that divides the courts or judges on different courts and I want to emphasize that both the border search is really not a national security, primarily motivated by national security. If you look at what the court has said, it has talked about protecting the nation's sovereignty but it's really only gone that far. The Supreme Court has not said national security and more than that, we think that national security can be adequately protected without exposing the cell phones of millions of people to these kinds of searches and in particular, we have not seen an example, a hypothetical that has been created that could not be addressed by an actual national security exigency exception. What is at stake when you authorize the search of millions of people is that we need to be able to search literally everyone at all times in order to protect national security and we think that that's strained and I understand the judicial modesty. Yes, your honor. And you've, okay, you saved time for rebuttal. Yes, your honor. I apologize. Mr. Steltz. Thank you, your honor and may it please the court. We're here on an interlocutory basis due to the review for that ruling and why this court should ultimately affirm that decision. The standards for a preliminary injunction in the district court are well known. It's been called an extraordinary and drastic remedy. It's only available if the movement has clearly carried their burden of persuasion on the four preliminary injunction factors. Typically, the reason for a preliminary injunction is to preserve the status quo, prevent irreparable injury and preserve the district court's ability to reach a decision on the merits. Now, on appeal, there's an additional layer because the district court's decision is reviewed not de novo but for abuse of discretion. And thirdly, when as here a preliminary injunction is denied, this court has said that it will reverse that denial only in extraordinary circumstances. So that is the prism or the really several layers of prism under which this court's analysis should occur of the preliminary injunction ruling. And in that regard, I'd like to put into context something that Judge Fitzwater commented on in his ruling, which was the way he described it was he said this motion had been presented to him in a very unusual procedural posture. And I'd like to flesh that out. Mr. Anabowi, when he first filed the suit, it was a pro se lawsuit. He is an attorney, but I don't believe he routinely engages in litigation of this type. His first complaint, the government defendants filed a motion to dismiss. There was an amendment. The government defendants then filed a motion to dismiss that second or that Judge Fitzwater, on review of that order, did agree that dismissal of the current complaint was necessary. But he decided to give Mr. Anabowi further leave to amend to try to plead his claims again. And at that point, Mr. Anabowi retained outside counsel who then proceeded to file a second amended complaint. Now, during this time, on several occasions, Mr. Anabowi agreed and asked the district court to essentially postpone all discovery and any sort of deadlines relating to that while the sufficiency of the pleadings was still being evaluated. So on page 198 of the record, there's a joint report where the parties, including Mr. Anabowi, basically agreed to this procedure. On page 362 of the record, there's a similar joint motion to put off these deadlines. So that's how the case developed, and that's why when the second amendment second amended complaint was filed, due to the way that Mr. Anabowi had structured it, along with the federal defendants, there essentially had not been any discovery at that time. Once the second amended complaint was filed by newly retained counsel, and then there was a preliminary injunction motion filed, as well as a partial summary judgment motion almost immediately. Now, on that record, that was before the district court, I think it's clear that there was no abuse of discretion by the district court in concluding that the, you know, the very high requirements for a preliminary injunction were not satisfied. And particularly just in terms of the timing alone and what had already occurred in the case, it had been something like two years since Mr. Anabowi's cell phone had been searched at the border. And certainly, we're not saying that by waiting two years to file a preliminary injunction motion that the claim is somehow time barred on the merits, but I think the lengthy delay shows that there was no irreparable sort of ongoing immediate injury. And likewise, despite the passage of all that time, the two years, there was really no concrete specific harm that was shown or proven to the district court. There was some general allegations about the type of information that was on the phone, but there was no concrete proof that, you know, this piece of information led to this discrete harm, despite the fact that over two years had passed. Likewise, in the context of the record, you know, in the second on border search procedures writ large across the government, in other words, government policies that apply generally. And yet, those government policies actually aren't even in the record. So, ICE and Customs and Border Protection have promulgated policies about border searches, electronic border searches. Those policies are referenced in the Second Amendment complaint, but the complete policies are not actually in the record. Now, they are online, but just as an illustration, they're not in the record, nor does the record contain, for example, reports that have been prepared pursuant to statute that Congress has directed to be prepared that show what the statistics are, how often these searches happen, what types of searches happen, how many travelers are subjected to them, things like that. So, I think the district court certainly didn't abuse its discretion by looking at this preliminary injunction motion and saying, this record is just not developed enough for me to issue extraordinary relief about these government policies writ large. And likewise, on the legal analysis of whether a likelihood of success had been clearly, you know, demonstrated by the movement, which was his burden to meet, there's just no error in Judge Fitzwater's ruling on that relied on heavily. Judge Fitzwater also, you know, appropriately looked to this court's precedents, including the 2018 Molino-Isadora decision, in which the court had essentially surveyed the state of border law, border search law, as it relates to electronic searches. In that decision, the court had explained that no court had ever required a warrant for these type of searches at the border. So, Judge Fitzwater, I think, was on firm ground in terms of, you know, recognizing what the applicable case law was, looking at that case law, and then ultimately concluding that the plaintiff's plaintiff simply had not met his high burden to obtain this preliminary injunctive relief. So, no error has been shown with respect to the preliminary injunction. And as we've said in the brief, we think that in this posture and the way this appeal has been briefed, that really should be the end of the matter, because there's no need for this district or this court to go beyond the preliminary injunction, which is the only thing that the court, you know, actually has jurisdiction for, to then review the partial summary judgment ruling. The partial summary judgment ruling did not purport to finally dispose of any claim in any way. In other words, the district court didn't grant judgment in favor of the government. We didn't, we hadn't moved for the district court didn't conclusively say that Mr. Anabowi's claims failed, you know, for all time. The district court simply said that in the context presented to him on that record, Mr. Anabowi was not entitled to essentially an early summary judgment in his favor. So, there's no reason that this court needs to review that decision in order to rule on the preliminary injunction motion. It's, it certainly is, there's an overlap of issues, but the court's precedence on, you know, its own jurisdiction make clear that simple, simply an overlap of issues is not enough to tee up all of these matters for interlocutory review. Otherwise, every preliminary injunction would essentially be transformed into a, you know, a final merits review, because there's always going to be an overlap of issues. The question is, is it absolutely necessary in order to meaningfully review the preliminary injunction ruling to also review the summary judgment ruling? And, you know, as we've mentioned in the brief, there's, it's just not, it's not necessary to do that. The court can, I think, easily rule on the preliminary injunction and should affirm that ruling without needing to rule on the partial summary judgment. And in fact, the preliminary injunction ruling was not, it was not simply an exercise where the court said, well, I've denied your partial summary judgment, therefore I'm also denying the preliminary injunction. That's not what occurred. So that's our, that's our position on the, on the second issue. I would like to also just briefly flesh out, there's all this, there's been a lot of talk about whether the, you know, border search doctrine currently applies essentially to these phones. I think the, I think the record or the legal analysis is clear from cases like Molina Isadora and from the many Supreme Court cases on this is that a border search is considered reasonable by virtue of the fact that it occurs at the border. So that's what the rule is. And here, there's no question that this is a, a device, an item that has been brought to the border and the person is seeking to carry it, you know, across the border. So by the plain language of what the border search doctrine is in terms of it applies to things or persons at the border, there's just no question that this is a border search. And that's confirmed by cases like the, this court's decision in Molina Isadora where it was quite, quite clear that the court, you know, considered the search of the, of the phone at the border, a border search. And it looked to border search case law to determine that issue in that case. But I do think it's, it is most of the cases that we see, certainly the Supreme Court cases and cases like Molina Isadora, these cases are often presented in the criminal context where there is, you know, factual development, there is a motion to suppress, there may be a hearing on that. So that, that differs from what we have here. I don't think it, I think, I don't think it cuts, I don't think it cuts against us though to say that, well, the, the district court has to go out on a limb and sort of decide these issues in the abstract without a record. So I know abuse of discretion has been shown in what the district court, and then what the district court did here. I'm happy to answer any questions the court may have. You know, I think we, like I said, the preliminary injunction is really the, you know, I think properly should be the focus of this appeal since that's the only actual jurisdictional hook for the appeal. And I think given the really quite high standard of review that applies even in the district court, and then you layer on top of that the additional abuse of discretion standard, you know, it's just a very high, it's a very high bar for a plaintiff to clear on appeal to try to get a preliminary injunction reversed, especially in this, in this posture. And, and we just don't think the record, you know, the record doesn't show any error, much less any sort of abuse of discretion that would warrant that kind of relief. So we would ask the court to affirm the denial of the preliminary injunction. We would ask the court to dismiss the remainder of the appeal, of the appeal to the extent the partial summary judgment ruling has been challenged. If the court does reach the partial summary judgment ruling, we think that it should also be affirmed, you know, for all essentially the same reasons that the district court didn't err in its legal analysis in the preliminary injunction. As I said, I'm happy to answer questions for the court, but if there's no questions, I will yield back the balance of my time and ask that the court affirm and dismiss in part. Thank you. Mr. Tutt, you need to unmute yourself. Thank you, Your Honor. And I'd just like to respond quickly. And these points are really important since these procedural things would be the death knell of this case if they weren't completely meritless and waived and would be judicially stopped if brought by, if made by a private litigant. I would like to point out that this, this issue of delay was not raised with the district court. That's why it's not the, not the basis of the district court's opinion. This is, this is sandbagging brought up for the first time on appeal. There was no, there was no reason given that he wasn't entitled to relief because he waited too long to seek a preliminary injunction. And the incredible conduct of the government here that sought a stay of all proceedings below when we sought to actually enhance the record and said, instead, wait for the outcome of the appeal. This, this conduct has been continuous throughout this case, seeking to delay and deny relief to an innocent man who's been repeatedly subject to degrading and humiliating searches at the border. It's really, it's really shocking. Second, this rule, the idea that the rule is that the border search is reasonable because it was at the border and for that reason alone justifies the search. Robinson says verbatim the same thing about searches instant to arrest. The rule is formulated exactly the same way. The rule of the Weeks case is even broader. It says it has always been the rule that an arrestee may be searched for evidence of a crime. Full stop. The Supreme Court said that is not the rule that applies to cell phones. They didn't overrule any aspect of Weeks. They didn't overrule any aspect of Robinson. It is not the rule. This court has to engage in a renewed Fourth Amendment balancing. That is the rule. This is a new technology case. Even before Riley, even before Carpenter, under the Kylo decision about heat imaging of the home, this court would be required, called upon to consider cell phones and all that they and what makes them unique. I want to return to this idea that this case doesn't have enough of a record. The record has everything that the court needs to rule on this motion for preliminary injunction. It has the fact that he was searched without a warrant. That is conceded. It has the fact that attorney-client privileged communications were taken and retained. It has the fact that almost every time he has traveled in five separate occasions, he's been subject to what we contend and what we believe the Supreme Court would agree is an unconstitutional warrantless cell phone search at the border. I just want to say modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans the privacies of life. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the founders fought. That's a direct quote from Riley. I'd also like to say that what we are asking for is not is is not exceptional. We are just asking the court to require border agents to do the same thing law enforcement officers do literally every day in thousands of contexts all over this country. Get a warrant. Border agents will still have the same power to search items and travelers at the border that they had for the entire history of this country before cell phones were invented, including during each and every one of the Supreme Court's decisions defining the scope of the border search exception. An international letter class mail was protected from being read by a regulation that requires warrants in the Ramsey case in the 1970s, and that's still the rule today. So cell phones will just get the same treatment that letter class mail receives. What about reasonable probability or reasonable suspicion to you can stop the cell phone from coming into the country until you obtain a warrant? What about that? Yes, absolutely. We believe that the cell phone can be seized just because it's a physical object at the border, so the cell phone can definitely be seized until a warrant can be obtained. And that is the same rule that was announced in Riley. The officers may take the phone. They may put it in a Faraday bag, which will prevent any remote interaction with the phone by any other device until a warrant is obtained, and then they can open the phone and we don't dispute anything about that. You say your client had been stopped and his phone searched five times? Five times. Over what period of time? Let's say three years? Yes. Okay. Were there any times during that same period that he traveled and his phone was not selected and searched? And let me be clear, we would supplement the record and we can supplement the record with an affidavit to this effect. There was not a time where he traveled where he was not searched. Okay. Well, I'm getting back to the question that Judge Owen asked originally. I think you said, if my numbers are correct, that there are some 30,000 people whose phones are the country over the course of a year, and yet he rings the bell five times. Are you aware if there's a particular reason why he's being chosen for this? It's hard to believe that he's been randomly chosen five times with no times that he's admitted. And your honor, we think that, yes, I absolutely agree. And we wouldn't object to these searches if they were supported by a warrant, right? I mean, that's the point, is he doesn't know. And part of what makes this record so difficult, and I know I'm out of time, but I think this is so crucial. Part of what makes it difficult to sort of develop the record, and the government hasn't ever said what they think we need to do to develop it more, is that we don't know why he was searched. And we don't know where to look for this information. And government agents are not rushing to the court to try and volunteer their reasons. And in fact, they've resisted all discovery. And so we are in this impossible position, and if the court refuses us relief, we will go back to the district court. And the district court took nine months to rule on our preliminary injunction motion. And this is the other problem, is if there wasn't enough evidence, if the problem was record related, nine months is just this continued delay, which is becoming a denial of relief on the merits. And so we will litigate this case. I want to ask a few questions. You say that they resisted all discovery. What discovery have you promulgated that they resisted? It all turns on the scheduling order immediately following the district court's denial of the preliminary injunction. So the court admonished us, I want more record and let's get on a normal We submitted a schedule that said, okay, well, first, just because we know the government does not want discovery, we'll go with requests for admission, 10 requests for admission. If that's not enough, we'll go to interrogatories. And it has a specific schedule about sort of gradiated discovery. And the government said, no, put the case on ice, because this appeal could resolve everything. That's the other thing that's shocking about the government's representations today is that they said, the court can put this case away because the Court of Appeals could weigh in, in a way that will be material to the court's resolution. So then coming to this court- You agreed to that. You didn't have to agree to that. No, no, we did not. We each submitted different statements. The defendants put in their statement and we put in our statement. And we said, we want to go, we want to keep going. We think that we'll very good reason to believe that they were conducted actually without suspicion, or if there was reasonable suspicion, we'll be able to contest it. And instead, the case was put on ice, which means it administratively closed. And so at this very moment, we could already be positioned to come back here with a great record or have a great record. But instead, we've been waiting this appeal. And so the government now coming and saying, you should essentially kick us back while we've been on pause in the district court for months is rich. So I appreciate the court's time and giving me additional time here. And thank you very much. And we urge you to reverse. Thank you. That will conclude the arguments before this panel this week.